**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

| | |
|---|---|
| JAMES E. W., II,[1] <br><br> Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO, Commissioner of Social Security, <br><br> Defendant. | Case No. EDCV 25-00872-AS <br><br> **MEMORANDUM OPINION** |

For the reasons discussed below, the decision of the Commissioner is affirmed.

---

[1]    Plaintiff's name is partly redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

**PROCEEDINGS**

On April 9, 2025, Plaintiff filed a Complaint seeking review of the Commissioner's determination that Plaintiff was no longer disabled and no longer entitled to a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. (Dkt. No. 1). On June 9, 2025, Defendant filed an Answer consisting of the Administrative Record ("AR"). (Dkt. No. 13). The parties subsequently filed opposing briefs setting forth their respective positions regarding Plaintiff's claims ("Pl. Brief" and "Def. Brief"). (Dkt Nos. 17, 20). The parties have consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 6-7).

The Court has taken this matter under submission without oral argument. See C.D. Cal. C. R. 7-15.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

In a Comparison Point Decision ("CPD") dated January 8, 2018, Plaintiff was found disabled beginning on December 2, 2016, due to mental disorders. (AR 100-13). On September 1, 2021, it was determined that Plaintiff was no longer disabled since that date, and this determination was upheld on reconsideration by a state agency Disability Hearing Officer. (AR 114-76). Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (AR 177). On September 27, 2023, ALJ Stacy Zimmerman held a telephonic hearing and heard testimony from Plaintiff, who was

2

unrepresented, Plaintiff's mother, and a vocational expert ("VE"). (AR 53-99). On February 28, 2024, the ALJ issued a decision finding that Plaintiff's disability ended on September 1, 2021, and Plaintiff had not become disabled since that date. (AR 13-23).

The following eight-step sequential evaluation process applies for determining whether a previously determined disability continues:

(1)    Is the claimant engaging in substantial gainful activity? If so, and the claimant is past any applicable trial work period, the claimant's disability ends. If not, proceed to step two.

(2)    Does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1? If so, the claimant's disability continues. If not, proceed to step three.

(3)    Has there been medical improvement as shown by a decrease in medical severity of those impairments present at the time of the CPD? If so, proceed to step four. If not, proceed to step five.

(4)    Is the claimant's medical improvement related to the claimant's ability to do work, i.e., has there been an increase in the claimant's residual functional capacity

3

("RFC")[2] based on the impairments that was present at the time of the CPD?  If not, proceed to step five.  If so, proceed to step six.

(5)  If there has been no medical improvement or if improvement is not related to claimant's ability to do work, do any statutory exceptions to medical improvement apply?  If none apply, the claimant's disability continues.

(6)  Are all of the claimant's current impairments in combination severe? If impairments are not severe, the claimant's disability ends.

(7)  Does the claimant possess a RFC to perform the claimant's past relevant work?  If a claimant can do past relevant work, the claimant's disability ends.

(8)  Is there other work that a person with the claimant's age, education, past work experience, and RFC can perform? If so, the claimant's disability ends. If not, the claimant's disability continues.

---

[2]     A RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R § 404.1545(a)(1).

4

See 20 C.F.R. § 404.1594(f)(1)-(9); see also AR 14-23 (ALJ applying this process).

Before proceeding through the steps in this case, the ALJ noted that at the time of the CPD, Plaintiff had the following medically determinable impairments: schizophrenia and anxiety disorder. (AR 15). These impairments resulted in a RFC suggesting Plaintiff would be unable to complete work activity on a day-to-day basis without exhibiting psychiatric symptoms. (AR 15; see also AR 111 (CPD noting same)).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity through February 28, 2024, the date of the ALJ's decision. (AR 15). Plaintiff had some earnings in 2018, 2019, and 2023, but his earnings did not rise to the level of substantial gainful activity. (AR 15). At step two, the ALJ found that Plaintiff had the following medically determinable impairments since September 1, 2021, which did not meet or equal a listed impairment: schizophrenia, anxiety disorder, Crohn's colitis, gluteal cleft cyst, and subcutaneous cyst of the back. (AR 15-17).

At step three, the ALJ found medical improvement occurred on September 1, 2021, and the impairments present at the time of the January 8, 2018 CPD had decreased in medical severity. (AR 17-18). At step four, the ALJ determined that medical improvement was related to Plaintiff's ability to work because it resulted in an increase to Plaintiff's RFC. (AR 17-18, 21). At step six, the ALJ

found that Plaintiff's current impairments in combination were severe. (AR 21).

At step seven, the ALJ determined that, since September 1, 2021, Plaintiff had a RFC to perform work at all exertion levels with the following nonexertional limitations:

> [Plaintiff] can follow simple instructions and complete simple tasks in a routine work environment; cannot have customer-service interaction with the public; can attend and concentrate for two-hour periods with normal breaks; can frequently interact with coworkers and supervisors but cannot perform tandem tasks or work as part of a team; can perform low stress work, which is defined as involving only occasional, simple decision making and occasional changes in the work setting.

(AR 18-21 (finding "persuasive" the available medical opinions about Plaintiff's RFC, and discounting Plaintiff's and his mother's testimony and statements suggesting greater limitations)). The ALJ also found that Plaintiff had no past relevant work. (AR 21).

At step eight, the ALJ found that, based on the impairments present since September 1, 2021, Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including packager, laboratory equipment cleaner, and warehouse worker. (AR 21-23 (adopting VE testimony at AR 86-88)).

6

Accordingly, the ALJ concluded that Plaintiff's disability ended on September 1, 2021, and Plaintiff had not become disabled since that date. (AR 23).

On December 4, 2024, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (AR 4-7). The Appeals Council had received additional evidence from Plaintiff but declined to "exhibit" the evidence, finding no reasonable probability that the additional evidence would change the outcome of the decision. (AR 5; see also AR 31-52 (evidence submitted for the first time to the Appeals Council)). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. See 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine if it is free of legal error and supported by substantial evidence. See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation and internal quotation omitted).

To determine whether substantial evidence supports a finding, "a court must consider the record as a whole, weighing both evidence

that supports and evidence that detracts from the [Commissioner's] conclusion." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (internal quotation omitted). As a result, "[i]f the evidence can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

Where, as here, the Appeals Council "considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." Brewes, 682 F.3d at 1163. "[A]s a practical matter, the final decision of the Commissioner includes the Appeals Council's denial of review, and the additional evidence considered by that body is evidence upon which the findings and decision complained of are based." Id. (citations and quotations omitted). This Court therefore has reviewed the evidence Plaintiff submitted for the first time to the Appeals Council in reviewing the ALJ's decision.

**DISCUSSION**

Plaintiff contends that the ALJ failed to give legally sufficient reasons for discounting Plaintiff's testimony and statements suggesting greater limitations since September 1, 2021, than the ALJ found to exist. (Pl. Brief at 4-11). After consideration of the record as a whole, the Court finds no reason

to remand this matter. The ALJ's reasoning in this case is adequate, and the Court discerns no material error.[3]

**A.    Summary of the Medical Record**

As detailed above, Plaintiff was found disabled beginning on December 2, 2016, due to mental health issues. (AR 111-12). On September 1, 2021, when Plaintiff was deemed no longer disabled, state agency review physicians found Plaintiff's Crohn's disease and other physical impairments were non-severe, and the current record showed that Plaintiff's mood and anxiety symptoms had been stable for at least a year: he had no hospitalizations or emergency department visits, he was sleeping well, he was socially engaged with others, he had been taking classes, and his mental status examinations were benign. (AR 115-37 (finding Plaintiff capable of performing "SRTS" (simple repetitive tasks) with "LPC" (limited public contact)). The available medical record the ALJ reviewed in this case is consistent with the state agency physicians' review.

Mental Health Treatment Record

Plaintiff had an in-patient psychiatric hold in November 2019. (AR 761-807). Subsequent mental health treatment notes reflect that his condition improved. In February 2020, Plaintiff

---

[3]    The harmless error rule applies to the review of administrative decisions regarding disability. See McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (An ALJ's decision will not be reversed for errors that are harmless).

reportedly was feeling stable and doing "okay" with his medication. (AR 532). He had stopped smoking "weed" at the end of November, yoga was helping to calm him, he was feeling more rested, his relationship was doing well, he was taking a history class, he was hoping to visit his sister in Minnesota, and he was feeling positive. (AR 532; see also AR 533 (January 2020 note also reporting improved symptoms)).

In May 2020, Plaintiff reported some symptoms of depression. (AR 542). His mental status examination was within normal limits apart from an unkempt/poor appearance. (AR 542). In June 2020, he was well groomed but anxious. (AR 543). In July 2020, he was well groomed, stable, anxious, and depressed. (AR 544). In October 2020, Plaintiff reported his mood was stable on his medications and he had no signs or symptoms of psychosis, but he had some restlessness at night for which he agreed to change the form of his sleep medication. (AR 594). He was able to enjoy activities with others, was focused on school, and denied any hallucinations or paranoia. (AR 594). In November 2020, Plaintiff reported his mood was stable, denied any depressive symptoms, was able to be social and actively engage in social events and activities, was interacting well with others, his anxiety was controlled, and he was sleeping throughout the night. (AR 596).

In February 2021, Plaintiff again reported his mood was stable, his anxiety was controlled, he was able to sleep through the night with good quality sleep, his appetite was regular, and he was staying active socially with friends, family and "work."

10

(AR 600).[4] In May 2021, he reported sleeping well, having a stable mood, no mood swings or depressive symptoms and well-managed anxiety. (AR 602). He was becoming more active in social efforts and had increasing energy and motivation to be around friends. (AR 602). In July 2021, he reported his medication had been helpful in maintaining mood stability and anxiety management, he was sleeping throughout the night, had a good appetite, was socially active and enjoyed the company of friends, and exercised daily. (AR 604). In September 2021, around the time he was found to have medically improved, Plaintiff reported his medication continued to be effective in maintaining mood stability and managing anxiety, he was sleeping well, his appetite was good, he was exercising, socializing with friends and family, and attending college classes. (AR 676). In December 2021, he again reported stable mood, controlled anxiety, doing well socially, having pleasant relationships with others, going to the gym, and feeling positive with boosted self-esteem. (AR 677).

In February 2022, Plaintiff reported his mood was stable, stating, "I feel normal with these medication[s]." (AR 678). He had not needed to take some of his medications, and he had been successful in taking classes and interacting with his peers at school. (AR 678).

---

[4]    A February 2021 treatment note for congestion reported that Plaintiff had a depression screening score of two, which was "negative" for depression. (AR 550-51). He only reported trouble with his sleep. (AR 550).

In April 2022, Plaintiff reported frustration and anxiety – he had decompensated with his depressive symptoms and insomnia when his medication was not dispensed due to insurance issues. (AR 679). He was having mood swings with depressive symptoms, low motivation, and loss of interest. (AR 679). However, he had started back on his medication two weeks earlier, and felt his mood had become more stable and his anxiety was better controlled. (AR 679).[5]

In October 2022, Plaintiff reported his medication was effective with mood stability and insomnia, he denied anxiety or irritability, his behavior had been controlled, and he had been socially active and pleasant with others. (AR 744). He was planning a vacation to Germany and was excited to start a new job as a massage therapist. (AR 744). He had just completed massage therapy school and was certified. (AR 744). In November 2022, Plaintiff reported doing well on his current medication with "good and stable" mood, controlled anxiety, no sleep issues, good appetite, he was enjoying activities with friends and family, enjoying his new job as a massage therapist, and was excited about his upcoming trip. (AR 742). This was the last mental health treatment note the ALJ reviewed.

---

[5]    Plaintiff's mental health nurse practitioner provided a letter dated July 1, 2022, stating that Plaintiff's symptoms continued to affect his functioning in his everyday life. (AR 746). Plaintiff's medication regimen had been adjusted and Plaintiff continued to be in communication to closely monitor its effects. (AR 746). The nurse practitioner noted Plaintiff had "made some progress over the past two years; however, his condition is chronic and will require continued mental health assistance." (AR 746).

Plaintiff supplied some evidence of mental health treatment for the first time to the Appeals Council. See AR 31-52 (evidence which post-dated the administrative hearing in this case). The new evidence reported some mental health issues from apparent medication noncompliance. An excerpt from the emergency department discharge instructions from San Antonio Regional Hospital dated October 31, 2023, notes that Plaintiff had been evaluated for schizophrenia and medication nonadherence and was treated with Olanzapine and discharged without the need for a psychiatric hold. (AR 41). Plaintiff was advised to begin taking his medications as previously prescribed. (AR 41).[6]

The new evidence includes an "In-Home Supportive Services ["IHSS"] Medical Evaluation" by a treating nurse practitioner dated December 10, 2023. (AR 32-33). The nurse practitioner was unable to assess Plaintiff's functional abilities/disabilities or capacity for self-care because Plaintiff had been treated via telehealth. (AR 33). The nurse practitioner reported, "during times of mania [Plaintiff] does not sleep which causes altered mentation. He has paranoia most days." (AR 32). His prognosis was "poor" in that he reportedly lacked insight into his problems and was not medication compliant. (AR 32). The nurse practitioner opined, without explanation, that Plaintiff was "currently" disabled from October 31, 2023, to November 10, 2023, noting that Plaintiff has a chronic condition that can be expected at any time he is not

---

[6]     There is also an excerpt from discharge instructions on January 12, 2024, which does not indicate the purpose of the visit or the emergency department course. (AR 42).

medication compliant. (AR 31). The nurse practitioner also opined that Plaintiff could be a danger to himself or others, should not drive, and needs someone to watch him. (AR 33).[7]

The new evidence also includes a "Notice of Certification for Intensive Treatment, etc." for a 14-day hold for inpatient treatment and medication stabilization beginning on February 6, 2024. (AR 38). Plaintiff reportedly was agitated, aggressive, delusional, and paranoid. (AR 38). Plaintiff apparently was discharged early on February 12, 2024, with expected "fair" prognosis and stabilization with medication and outpatient treatment compliance. (AR 39).

Crohn's Treatment Record

The available treatment notes suggest that Plaintiff's Crohn's disease has been in remission since well before Plaintiff was found no longer disabled. A February 2020 treatment note reports that Plaintiff's Crohn's disease had shown endoscopic and microscopic remission in November 2018. (AR 1094, 1114-15). Since Plaintiff's last visit for Crohn's disease in June 2019, he continued to be "doing well" from a gastrointestinal standpoint, and he denied flares or ongoing gastrointestinal symptoms. (AR 1094). At his next visit in August 2020, Plaintiff notedly continued "to be doing

---

[7] There is a second IHSS Medical Evaluation form with some noted limits, but no physician certification. (AR 36-37). It is unclear who completed this form, but the handwriting looks like Plaintiff's mother's writing. (AR 36-37; compare AR 50 (handwritten letter from Plaintiff's mother)).

clinically well" – he had regular bowel movements without cramping/pain and blood in his stool, and denied ongoing perianal pain or drainage. (AR 557). He again had no ongoing gastrointestinal symptoms. (AR 557). At his next visit in May 2021, Plaintiff reported he had been doing well and had good control of his symptoms from his infusions. (AR 577-78).

Plaintiff followed up in April 2022, after he was found to have medically improved, reporting he was doing well on his treatment regimen, since using Metamucil regularly his bowel movements were more formed, and although he has occasional perianal discomfort he had no drainage. (AR 644-45). He continued to report he was doing well in August 2022. (AR 1379).  In September and October 2022, Plaintiff's Crohn's disease reportedly was "well controlled with inactive disease" on his medication. (AR 712-13).

**B.    The ALJ Gave Legally Sufficient Reasons Supported by Substantial Evidence for Discounting Plaintiff's Testimony and Statements.**

Plaintiff contends that the ALJ provided legally insufficient reasons for discounting Plaintiff's testimony and statements suggesting greater limitations than the ALJ found to exist for the period beginning on September 1, 2021. In summarizing his alleged limitations, Plaintiff refers mostly to limitations  as reported by his mother. (Pl. Brief at 4-6 (discussing Plaintiff's mother's Function Report Adult – Third Party form at AR 290-97, and to a lesser extent the testimony by Plaintiff and his mother.  Although

15

ALJs apply different standards for evaluating a claimant's statements versus third-party statements (like Plaintiff's mother's), see, e.g., Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (discussing different standards), the ALJ found Plaintiff's mother's statements were "essentially the same" as Plaintiff's, and applied the same reasoning for rejecting both. See AR 19-21. For ease of analysis, the Court has considered Plaintiff's statements and his mother's statements without distinguishing the two in evaluating the ALJ's reasoning. Plaintiff's claim fails even if the Court attributes statements made by Plaintiff's mother to Plaintiff.

### 1.   Applicable Law

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step analysis. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. Garrison, 759 F.3d at 1014. "In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (emphasis in original) (citation omitted). "Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Id. (citation omitted).

16

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. Id. at 1014-15; see also Robbins, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." Garrison, 759 F.3d at 1015 (citation omitted). The ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities for an adult." SSR 16-3p, 2017 WL 5180304, at *3.

While the ALJ cannot "delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness," Trevizo, 871 F.3d at 678 n.5, the ALJ may consider "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and the claimant's daily activities." Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).

In addition, the ALJ may consider the observations of treating and examining physicians regarding, among other matters, the functional restrictions caused by the claimant's symptoms. Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); accord Burrell, 775 F.3d at 1137. However, it is improper for an ALJ to reject subjective testimony based "solely on a lack of objective medical evidence to fully corroborate the claimant's allegations." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citation omitted); see also Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir. 2022) (reaffirming same but observing that inconsistency with the medical evidence is a factor that can be considered; "When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."); SSR 16-3p, 2017 WL 5180304, at *5 ("Objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities. . .").

The ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted); see Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony

18

regarding pain." (citation omitted)). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

**2.    Testimony and Statements from Plaintiff and his Mother**

The record contains similar Function Report forms dated May 2, 2022, from Plaintiff and his mother. (AR 282-97). Plaintiff reported that he lived with his mother/caretaker, and that his mental health conditions make it hard for him to maintain/manage a daily routine – his moods change rapidly, he has difficulty in groups, confined settings and social spaces, he needs to walk sometimes to calm himself, and he cannot sit, stand or walk too long without flexibility to move/adjust his environment to avoid stress and discomfort. (AR 282).

His daily activities consisted of going to the bathroom, sometimes showering, dressing, going to get tea or coffee, walking or vaping to relax, eating sometimes, preparing for class/zoom, doing homework, going to the store, preparing for doctor appointments or video calls, sometimes exercising, eating dinner, relaxing, and watching a movie or television show. (AR 283). He did not always do his personal care due to being tired, forgetting, and not being motivated. (AR 283). He needed reminders to put away clothes, make is bed, clean up messes, for "bathroom stuff," and to take his medications. (AR 284). He could prepare some quick

meals 2-3 times a week and snacks daily. (AR 284). With reminders, he could do laundry, iron, household chores (though he tends to slack off), and take out the trash. (AR 284). He goes outside daily walking or driving/riding in a car, could go out alone, could shop in stores for up to 30 minutes, and could pay bills (sometimes with support) and count change. (AR 285).

His hobbies include watching shows or videos, playing video games, online media, working out in a gym, and facetiming to play videos, but he is not motivated to do these activities as often as he did before his illnesses began. (AR 286). He spent time with others in person, on the phone, via text and video chat. (AR 286). He attended his doctors' appointments by video/phone conference, and then was mainly home or with family/friends due to the Covid-19 pandemic. (AR 286). He sometimes needed someone to accompany him for support, mostly with "medical business," and did not attend peer activities as often, did not go to big events/parties, and he refrained from drinking/smoking "as much." (AR 286).

Plaintiff checked that his anxiety, moods, depression, and Crohn's disease affect all possible areas of functioning. (AR 287). He could walk for 30 minutes before needing to stop to rest, could pay attention depending on whether he is focused or distracted or tired, sometimes finishes what he starts, follows written instructions pretty well when he is focused/not under stress, and gets along with authority figures well but can get upset and needs support to handle stressful situations. (AR 287). He does not handle stress well though he does better with medications and "good

20

rest." (AR 288). He avoids high pressure settings/situations and is not as sociable. (AR 288). Plaintiff reported that he had been fired from two jobs due to his conditions causing conflicts at work, disrupting his schedule, or making him unable to manage his job duties. (AR 287).

Plaintiff's mother reported in her form that Plaintiff is in her "care/home 24/7," and that she oversees his medical care, personal care, and some social and family activities. (AR 290). She reported that Plaintiff requires daily medications to manage his mental illnesses/sleep, and requires IV treatments every eight weeks and a special diet for his Crohn's disease. (AR 290). Plaintiff's daily activities include resting, making up for lost sleep, doing chores or running errands or exercising if he is able. (AR 291, 297). Plaintiff required "constant" reminders to put grease in his hair, flush the toilet, put trash in the trash can, clean the kitchen after making a mess, change his bed sheets, do chores, stay organized not cluttered, and take his medications. (AR 292). She reported that Plaintiff has more patience with his medications and does not get upset when he does repetitive steps to prepare meals, but he does not prepare meals if he is tired/anxious/upset. (AR 292). He could do "lite" housework with many delays because he is easily distracted, his moods cause him to do chores slowly, he forgets, and is tired or anxious. (AR 292).

Plaintiff's mother admitted that Plaintiff has been on "more effective medications and therapy that [] manage[] his conditions and help[] him relax and focus better in life!" (AR 294). She said

21

he does not like to be around unfamiliar people "too long," tends to get anxiety or pressure to be social, and requires her assistance to handle medical appointments, chores, basic living routines, money and bills, and to reduce his stress. (AR 295).

Plaintiff appeared for the telephonic hearing with his mother present. At the outset of the hearing, the ALJ advised Plaintiff of his right to representation (which Plaintiff said he understood) and asked if Plaintiff wanted to go forward without a representative. (AR 57-58). Plaintiff said, "I'm asking my mom," and had an off-the record discussion then said, "It's okay to go forward." (AR 58-59). Plaintiff's mother added, "We'll go forward. We're ready." (AR 59).[8]

---

[8]     The ALJ gave Plaintiff and his mother two weeks after the hearing to review his file and to advise whether Plaintiff had any additional treatment not included. (AR 60, 65). By letter dated January 25, 2024, the ALJ notified Plaintiff of additional medical evidence proposed to be entered into the record, and gave Plaintiff an opportunity to submit written comments about the evidence, written statements about facts/law which may apply in light of the evidence, any additional records Plaintiff wished to have the ALJ consider, and written questions for the author(s) of the new evidence. (AR 388-89). Plaintiff's mother replied by letter dated February 7, 2024, reporting that she had not had an opportunity to review Plaintiff's notes, and that Plaintiff had been in emergency care that week due to coming off Zyprexa which made him unable to manage his moods, anger, and aggressive behavior. (AR 393). He was inconsistently taking his medications, had been back on his medication since February 6 (the day before), but had not fully recovered enough to resume his daily routines at home and school "as of yet." (AR 393-94). Plaintiff's mother provided some records documenting Plaintiff's current class schedule (AR 396-400), but no records from his recent emergency care. See AR 14 (ALJ's decision noting same and indicating the record was then closed). As detailed above, Plaintiff provided some records from Plaintiff's emergency care for the first time to the Appeals Council. (AR 5, 38-39).

The hearing transcript suggests that Plaintiff may have had some difficulty during the hearing. Plaintiff's mother noted that Plaintiff had to leave the room while the ALJ was discussing the status of Plaintiff's file. (AR 60). Plaintiff explained that he was "not comfortable right now" because of his Crohn's disease. (AR 61-62). When the ALJ advised Plaintiff of the issues to be decided in his case and asked whether Plaintiff or his mother had any questions, the following occurred:

> [Plaintiff's mother]: I'm sorry. What's going on? James is in distress. What's going on? Yeah, he's tearing and –
>
> ALJ: Mr. [W], are you okay?
>
> [Plaintiff's mother]: I didn't – yeah. James – Judge, he's really distressed. And under the circumstances, abruptly canceling his benefits, it's been a real strain on him. He's also timid, so he's been trying to manage, and you know, deal with the hardship of that and just – yeah. [INAUDIBLE] position.
>
> ALJ: Okay. So are you going to be okay with going forward with the hearing today, or do you need a break?
>
> [Plaintiff's mother]: Do you need a break? She's asking.

23

[Plaintiff]: Oh, she –

[Plaintiff's mother]: Yeah, it's been a build-up to the hearing, and it's – yeah, challenging just to keep his stress, you know, at bay, you know, as much as we can, which he's never absent, you know, from having elevated anxiety and just stress and – and everything. So this is not – yes, an ideal situation for him. But we're going through it and trying to get him through it as best we can for his own benefits and livelihood. James, she's asking if you think you're going to be able to go forward? What do you think?

[Plaintiff]: Yes.

ALJ: Okay.

[Plaintiff's mother]: Yeah, it will be an emotional case, but yeah, he's here.

(AR 67-68). Plaintiff's mother then stepped out during Plaintiff's testimony. (AR 69).

Plaintiff testified that he was unable to work because "[t]he job tends stress me out to the point where I can no longer work with people, and I need somebody – the people I work with and jobs that I was working took me to the edge, so I can't control my anxiety anymore and to treat me [INAUDIBLE] because of my race and

24

who I am as a person. And I don't get to so like be the best worker in the workforce. . . . I'm always discriminated against, but I'm a good worker, but when I do. That's what people in social [INAUDIBLE]." (AR 69-70). Plaintiff said he had issues with waiting for anything which "messes with [him]." (AR 76). Plaintiff also had issues with his Crohn's disease in that if he does not spend enough time in the bathroom wiping completely, "things may like leak out," and he will have to go back to the bathroom. (AR 76). He said it is "uncomfortable" and "not okay," and that he was uncomfortable sitting during his testimony but he was "just bearing with it." (AR 76-77).

Plaintiff had not worked since 2019. (AR 70). He had been in college since 2013, but he had to "cut back" and "not be where [he] should be. . . because of this." (AR 71, 74-75). He then was attending Cal Poly in person, taking 15 units and studying psychology. (AR 71-72). He anticipated graduating in two years at that course load level. (AR 75).

Plaintiff was also receiving mental health treatment and was taking Zyprexa which he said helped but "not really." (AR 72).[9] Plaintiff was not sure if he was getting help with college through a disabled students' program, but he did not think so. (AR 72-73). Plaintiff drove himself to school. (AR 73). Plaintiff said his

---

[9] A September 5, 2023 letter from Plaintiff's mother on his behalf reported that Plaintiff had taken many different prescriptions but none of them had gotten rid of Plaintiff's "overwhelming brain, ruminating thoughts, fluctuation mood changes, severe depression, or physical health problems." (AR 745).

mother helped with daily activities by providing a place for Plaintiff to live, cleaning, helping with laundry, and reminding Plaintiff of important things Plaintiff needed to do. (AR 73). Plaintiff's mother was working through "IHSS" (In Home Support Services) as Plaintiff's caretaker. (AR 73, 80-81).[10]

Plaintiff had an externship with Massage Envy earlier in the year, and was attempting to get a job there but he was not hired. (AR 73-74). Plaintiff had obtained a massage therapy license or credential in September 2022, from the National Holistic Institute in Ontario. (AR 74). Plaintiff said he had done the training but he had never gotten a job "anywhere officially under an institution." (AR 74).

Plaintiff said on a typical day he gets on a "streaming service" to play video games – he used to hang out with friends but he did not have any friends anymore. (AR 75). He goes to school on Mondays and Thursdays, and on the other days he tries to do dishes at home. (AR 75).

Plaintiff's mother testified that Plaintiff has a "very fragile, delicate mental health disorder" along with his Crohn's disease. (AR 78). She said Plaintiff is very intelligent, ambitious, has goals, and "it's been a challenge for him." (AR 78). She said he has anger, meltdowns, manic episodes, and becomes

---

[10]    As of May 2023, Plaintiff was approved for 121 hours and 48 minutes of In-Home Support Services per month. (AR 748-49).

distressed very easily. (AR 79). She said that Plaintiff has special accommodations in school allowing for more time to do his work. (AR 80). She said Plaintiff is constantly under stress, in distress, dealing with anxiety, and is just angry and upset in part because his disability benefits had been discontinued. (AR 81).

Plaintiff's mother said that she does "everything" for Plaintiff – housekeeping, cleaning, and prepping meals. (AR 81). She said on a typical day Plaintiff rests, maintains his sleep pattern, tries to relax, tries to walk, watches TV, and plays games. (AR 83).

### 3.  Analysis

The ALJ found that Plaintiff's "medically determinable impairments could have reasonably been expected to produce the alleged symptoms," but his "statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely consistent with the objective medical evidence and other evidence of record. (AR 19). The ALJ reasoned: (1) treatment notes revealed that treatment had been "generally successful" in controlling Plaintiff's symptoms, i.e., (a) Plaintiff "reported improvement in his mental impairments when he started taking medications as prescribed; he reported stable mood, controlled anxiety, sleeping well through the night, feeling rested during the day, being focused at school, being socially active, and enjoying the company of friends" (AR 19 (citing AR 594, 596, 600, 602, 604, 676-79, 742, 744)); (b) Plaintiff's treatment providers

27

"noted he was stable and improved with medications and other treatment modalities" (AR 19 (citing AR 714, 1268, 1380)); and (c) mental status examinations "have been generally normal" (AR 19 (citing AR 1017, 1020, 1022)); and (2) despite Plaintiff's allegations of disabling mental problems, he described daily activities inconsistent with these limitations in that he reportedly was able to attend college full time, complete his massage therapy certification, extern at Massage Envy, vacation in Germany, go out alone, drive a car, shop in stores and by computer, pay bills, count change, handle a savings account, and play video games online, and his earnings records showed he was able to work earning $1,580 in the first quarter of 2023 (AR 19-20 (citing AR 71-74 (Plaintiff's testimony about his college work, massage therapist certification, and externship with Massage Envy); AR 230-31, 238 (Plaintiff's 2023 earnings records); AR 248-55 (Plaintiff's Function Report form); AR 742-44 (most recent mental health treatment notes that were before the ALJ stating that Plaintiff continued to go out and enjoy times with friends and family, socialized, had completed his massage therapist certification and was enjoying his new massage therapist job, and was planning for and excited about a trip to Germany)).

The ALJ provided clear and convincing reasons, supported by substantial evidence in the record, for discounting Plaintiff's testimony and statements. As noted above, a lack of corroborating objective medical evidence is relevant to an ALJ's evaluation of a claimant's statements, so long as the ALJ does not reject statements solely on that basis. See Bunnell v. Sullivan, 947 F.2d

341, 345 (9th Cir. 1991) (en banc) (where "the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain") (citing Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986)); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d at 1227. "When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." Smartt v. Kijakazi, 53 F.4th at 498 (emphasis original).

Here, the ALJ properly relied on inconsistencies between the extreme symptoms/limitations Plaintiff and his mother alleged, and the available medical record leading up to and after September 1, 2021, which reflected that Plaintiff's impairments admittedly were controlled/stable with treatment. (AR 19). Indeed, the record that was before the ALJ suggested that Plaintiff's conditions were stable and controlled by his medications when Plaintiff was medication compliant. Even when Plaintiff reported to his provider that his depressive symptoms and insomnia returned because he had stopped taking his medications due to insurance issues, he also said that two weeks after he resumed taking his medications, he felt his mood had become more stable and his anxiety was better controlled. (AR 679). He had no other noncompliance issues or decompensation reported in the post-September 1, 2021 record that the ALJ reviewed. "Impairments that can be effectively controlled with medication are not disabling. . . ." Warre v. Comm'r, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations omitted). A favorable

response to treatment can undermine a claimant's complaints of debilitating limitations. See Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) ("evidence of medical treatment successfully relieving symptoms can undermine a claim of disability"); Tommasetti v. Astrue, 533 F.3d at 1040 (claimant's response to conservative treatment undermined his reports regarding the disabling nature of his pain, as did his testimony that his diabetes was controlled by medication). The ALJ's reliance on Plaintiff's favorable response to treatment was a clear and convincing reason supported by substantial evidence for discounting Plaintiff's complaints of extreme limitations.

The new evidence the Appeals Council reviewed does not undermine this conclusion. The evidence suggests that Plaintiff's mental health symptoms return when he is noncompliant with his medications. (AR 31). Plaintiff had two instances of decompensation due to medication noncompliance after the administrative hearing and before the ALJ's decision. (AR 38-39, 41). However, like the one instance of decompensation reported in the record the ALJ reviewed (at AR 679), the new records suggest that Plaintiff's condition stabilized with medication compliance. Plaintiff apparently required outpatient treatment on October 31, 2023, because he stopped taking his medications. (AR 41). Plaintiff's nurse practitioner suggested that Plaintiff was only "disabled" from October 31, 2023 to November 10, 2023, or eleven days after Plaintiff went to the emergency room and was instructed to resume taking his medications as prescribed. (AR 31, 41). Plaintiff required inpatient treatment in February of 2024, but he stabilized

30

enough to be discharged from the hospital after six days of an anticipated 14-day hold, with expected stabilization with medication and outpatient treatment compliance (AR 38-39). When Plaintiff's mother raised the fact of this psychiatric emergency with the ALJ by letter the day after Plaintiff was admitted for inpatient treatment in February, she stated that it was due to Plaintiff coming off his medication, which he had since resumed but he had not fully recovered "as of yet," suggesting she also expected Plaintiff to recover once he was back on his medication. (AR 393).

Nothing about the new evidence that was before the Appeals Council suggests that Plaintiff was as disabled as he and his mother claimed he was from September 1, 2021, through the date of the ALJ's decision. And nothing in the record the Appeals Council reviewed suggests that Plaintiff became disabled after the administrative hearing in this case since Plaintiff's apparent episodes of decompensation were brief and do not suggest expected disability for a continuous period of 12 months or more. See 20 C.F.R. § 404.1509 (listing duration requirement). If Plaintiff's condition has since deteriorated, he can apply for benefits for a new disability period.

The ALJ also properly relied on Plaintiff's admitted daily activities to find he was not as limited as he alleged since September 1, 2021. An ALJ may rely on a claimant's daily activities in discounting symptom testimony. See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (daily activities may be used to discount

31

subjective complaints where the daily activities "contradict [a claimant's] other testimony" or "meet the threshold for transferrable work skills"); see also Ghanim v. Colvin, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (daily activities have bearing on a claimant's credibility where the "level of activity [is] inconsistent with the Claimant's claimed limitations"). Here, the fact that Plaintiff was able to drive, go out alone, stop in stores, pay video games online, attend college full time (even with special accommodations), complete a massage therapist certificate program in Ontario, and work some in the first quarter of 2023, suggests that he was not so gravely limited as he and his mother's allegations suggest. See Valentine v. Comm'r, 574 F.3d 685, 693 (9th Cir. 2009) (while daily activities did not suggest Plaintiff could return to his prior work, they did suggest that his "later claims about the severity of his limitations were exaggerated").

The ALJ's reasoning is sufficiently specific for the Court to conclude that the ALJ did not arbitrarily discount Plaintiff's testimony. The ALJ adequately explained why the record did not support Plaintiff's claimed limitations. Compare Brown-Hunter, 806 F.3d at 491 (finding fault with ALJ's conclusion that the claimant's limitations were less than alleged where the ALJ merely summarized the medical record without explaining why it undermined the claimant's allegations).

Because the ALJ discounted Plaintiff's testimony on legally permissible grounds and the ALJ's reasoning is supported by substantial evidence, the Court will defer to the ALJ's interpretation of the evidence. See <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1464 (9th Cir. 1995) (court will defer to an ALJ's credibility determinations when they are appropriately supported in the record by specific findings justifying the decision).

**ORDER**

For the foregoing reasons, the decision of the Commissioner is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: May 12, 2026

_____/s/_____
                      ALKA SAGAR
          UNITED STATES MAGISTRATE JUDGE

33